We'll move on to our next case, 22-2007, United States v. Alqahtani. Good morning, and may it please the court, Mr. Michalowicz. My name is Joel Myers, and I represent the appellant in this case, Hassan Alqahtani. My hope is to reserve two to three minutes for rebuttal, but seeing my colleagues before, I'm not sure that's going to be possible. Okay, well, just keep an eye on your clock, and if you get a chance. Thank you. Hassan Hussein Alqahtani is no terrorist. He is a student who sought to enrich his life by seeking higher education in the United States, the very person I believe that we as a country want. But in December of 2019, his visions, the American dream, were cut short by the tactics employed by the government. Scare tactics employed in seeking the search warrant in this case resulted in misleading Magistrate Judge Karen Molson into authorizing the search warrant. Relying on the evidence seized pursuant to the search warrant, Mr. Alqahtani was indicted as an alien in possession of a firearm. After the first mistrial in this case, he was convicted and sentenced to 30 months in prison. He's already served that time, and he's currently in ICE detention in El Paso. I'm asking the court to reverse Mr. Alqahtani's conviction for several reasons or on the alternative to remand it to the district court for resentencing. There are four main issues in my brief, but for the purposes of oral argument today, I intend to only focus on three, unless the court has questions, of course. And those three would be the search warrant itself, the hearsay testimony elicited at trial, and then the four-level sentencing enhancement similar to what the court has already heard. Can I ask you, counsel, to start with the hearsay? Yes. Why wasn't the curative instruction given in this case that you agreed was appropriate sufficient here to solve any issue, even if it was an erroneous admission? Well, interestingly enough, the curative instruction I think specifically stated it was designed to explain the background of the government's investigation. And merely by that, it begs the question, what background was that testimony explaining? That testimony, those statements actually came after the government's investigation was already concluded. I'm sorry. Maybe I'm misunderstanding you. Are you saying that the curative instruction was no good? I'm not saying in isolation the curative instruction was no good. Because you didn't challenge that. Correct. That is correct, yes. I'm saying that applying the curative instruction, it really didn't relate to the evidence before the case. The curative instruction itself, if hearsay was to be given to explain the background of an investigation, I think the instruction is proper. However, by applying that instruction, it begs the question, what background of the investigation was this evidence designed to demonstrate? Okay, so your position is that the curative instruction didn't actually cure anything? Correct. If you'd like me to stay on that point, or I'll pivot back. Well, just because of when the curative instruction was given, or was it something about the content of the instruction that you said makes it inapplicable to this issue? I think neither, Your Honor. I think it's more about the substance of the evidence itself. The testimony by Task Force Officer Sullivan related to the hearsay statements of Mr. Al-Qahtani's wife. Those statements were elicited after the execution, or we could say even during the execution of the search warrant. During? After the investigation. Well, I think it was all in the same context, but it was, yeah. Go ahead. Right. So it came at the tail end of the government's quote, unquote, investigation. The search warrant itself is a clear indicator of what the government's investigation, albeit in my opinion very brief, looked like. That Mr. Al-Qahtani was always the target of this investigation. So that statement that is being introduced, as the court pointed out, which would have been proper to discuss the background of the investigation. There was no background for that statement itself to focus on. So why did you agree to the curative instruction? What was the point then, if it didn't actually respond, if it wasn't responsive to the problem? I brought up these, you know, same issues before. I thought the instruction itself was an appropriate instruction, if that's what the reason for the hearsay being emitted. And quite frankly, then be able to, you know, argue to the jury that doesn't explain anything. I think the instruction itself is a proper instruction. I just don't believe that it actually, the statement of Tess West Officer Sullivan, explained anything. And I think it's important to note that was the one big difference between the first trial and the second trial, the introduction of that statement. And I can't say what, you know, two juries might look at the same evidence and have a completely different conclusion. But I think it's clear on the record before the court that the only major difference between the two trials was the statement. So I don't believe that the introduction of that statement could be minimized in any fashion. And the harm of eliciting that statement and having that statement before the jury was overwhelming. I mean, if we recall that Hassan was not home during the execution of the search warrant. There were multiple other parties that were present at home. Hassan's wife is a United States citizen who would be permitted to possess the firearm. The firearm was found in a jointly shared space. And certainly I will concede, as I'm sure my colleague will point out, DNA evidence, fingerprints, obviously on the other side. But the orientation of the fingerprint evidence, inconsistent with both the testimony of the alleged eyewitness in this case, and inconsistent with how somebody would actually hold a firearm, which in my opinion I would submit would suggest an inadvertent touching. Similarly, the location of the item itself can explain why DNA would be present. And again, this was a mixed combination of DNA, including three other individuals. One female, which there was no evidence one way or the other who that was, but I believe we can safely assume that it's Mrs. Al-Qahtani.  Okay, did you suggest at trial that, did you advance any type of theory that the government didn't investigate to determine whether it could have been someone else's firearm? At both trials, yes. Okay, so isn't that a problem for you with the wife's statements? I mean, can't they properly be used once you bring that up to show that the government was asking questions as to whether it could be somebody else's? Indeed, but if the purpose of admitting those statements was to explain the background of the investigation, the investigation had already been complete, it had already focused on Mr. Al-Qahtani, and then even armed with that information, having questioned the wife. There's nothing that the government did any differently based upon that information. So they can't point to it, oh, once we eliminated Mrs. Al-Qahtani as the potential possessor or owner of this firearm, then we did X, Y, or Z.  Well, I mean, they thought, they had information that he might say it was hers if they came and found the gun, because that was what the informant said. Allegedly, sure. Yeah, I mean, that's what we have in the record, is that they were told that. Yes. And so they go and search, but they determine that they have enough to get a warrant to go look in the house to see if the gun is there, so they go do it. And why isn't it eminently reasonable at that point, even though they think all fingers are pointing at him, gosh, we better make sure, we better eliminate as part of this that it's not the wife's. Ask her if it's hers. I'm not saying that that is an unreasonable investigative effort, but there's nothing to indicate that armed with that information they did anything differently than they would have done. Well, there was nothing to do. She said it wasn't hers, right? Well, she made some differing comments. Yeah, she certainly didn't claim ownership of it. As she did, and then maybe distanced herself from it. And certainly I would submit that distance herself certainly with knowledge or specific knowledge about the firearms. Okay, fair enough. But again, I think if you focus and look at the evidence itself in totality, and then adding that, that that admission of that hearsay statement certainly tipped the scales in favor and was very harmful and had a significant prejudicial effect on Mr. Al-Qahtani. Was it invited by the statement, by opening statements? I don't believe it was invited. I know the court found that, and we certainly tussled with that. I don't believe that that was invited. Why? Why? I mean, the opening statements tell the jury what you're going to prove. I mean, it's a common trial strategy, at least when I was a lawyer, to then figure that you could put on any evidence that addressed the parameter of things that the other side said were or were not going to be proven. And certainly, but Judge, it was our position in the trial that we were not going to sit there and have no way to even challenge the government's evidence. So it wasn't like putting the entire government investigation necessarily on trial, but we didn't have to sit there and not challenge what the government did and the specific steps that the agent take, and mostly done in the context of acquiring the search warrant, not necessarily the entire investigation that came up after that and the providence of whose gun it indeed was. You're not suggesting, are you, that before they went to get a warrant, they had to go do an extensive investigation to eliminate possibilities that other people might have owned the gun, are you? Not all people, but I think it would have been very reasonable to determine whether or not Mr. Al-Qahtani was married. They said they had all these databases which they could search, and that whether there were other people, if a firearm was present in that house, whether that person would be permitted to possess it, such as Mr. Al-Qahtani's wife. That was the focus of the question. It wasn't putting the entire government investigation on trial. And I think it would be a reasonable step for the agent to take if they were seeking a search warrant for a particular location, to know who lives at that location and what their status would be. If there were felons in location, that would have been an important piece of information to have, how many people live in that location, the size of the location, and they went and they investigated it. They went to the leasing agent, found out who was on the lease, found out both of them. I don't think we need to investigate the possibility of all people, but they knew of two people that were on that lease and lived at the location. And they had further information about that as well. All right. So you wanted to save some time. Let's see if anyone has any questions for you. I do. Okay, go ahead. All right. If we need to go over a little bit, that's... No, that's fine. I'm not going to save my time. Okay. I just wanted to clarify something in the briefing. So with respect to the Franks hearing, sir, are you appealing the denial of the Franks hearing? Yes. Okay. Why is the government saying you're not? I don't understand, and I'm going to have to let Mr. Mishlevitz brief the court on that. We appealed the court's order, which denied suppression and denied the Franks hearing. I don't know how we would parse the two of those. That was the order. So what's the remedy on the denial of the Franks hearing? I would imagine the court can reverse the conviction and remand it for a possible Franks hearing. Or not a possible Franks hearing, but a Franks hearing in this case. That the court should have held it. Why would the court have to reverse the conviction first? Why couldn't the court just remand for the Frank hearing? I don't know that... And then, based on that hearing, tell the district court to rule appropriately. I'll take it, however the court wants to get a Franks hearing. Half a loaf. Whatever you guys want to do, I'm fine with, as far as that's concerned. There are four different outcomes. I see only one minute left. I know the court is very conscientious. Go ahead and answer. Go ahead and do what you need to do here. Thank you very much, Judge Carson. Four outcomes. We can suppress the evidence in this matter, which would result in dismissal. We can order a new trial. I didn't mean to use the royal way. I apologize. Based on task force officer's solvence testimony. Order the Batson Challenge. Or resentencing for procedural error based upon the four-level enhancement. Certainly, I ask the court to choose option number one. To reverse and remand this for further proceedings after suppressing the evidence in this case. I think looking at the search warrant itself, and I know we didn't spend a lot of time doing that. I believe I did in the brief that the search warrant is insufficient on its face even getting outside of the Franks hearing. But in the Franks context, the material misrepresentations and omissions are tragic in this case. And it calls for a reversal. And I would ask the court to do so. I'll tend to my remaining four seconds. Well, let me ask you a question. I've got one more. Okay. You go first. Okay. Mine's straightforward, I hope. Why aren't the 302 reports in the record? Are they in the record? I couldn't find them. I don't know. I'm sorry I don't give a straightforward answer. I know you're talking about the court relying on them as the quote-unquote tipping point. I don't know why they're not in the record. I'm not sure. I'm sorry. Judge Carson, I know you had a question as well. So we were talking about the search warrant, and you said it had many material misrepresentations. And a misrepresentation suggests like an intent to mislead. Oh, I'll say that, absolutely. I'm not trying. And I was just going to give you a second to elaborate on that. Because I'd give you maybe some material, or maybe I won't even give you material, but I'll give you mistakes, but I'm not sure I'm seeing like any intent to mislead. I can focus on two. The first one, I think, the more egregious one, AM and CHS, describing them as two distinctly different people. There is no reason whatsoever to do that. I understand maybe in order to protect a confidential human source versus – But it hadn't been – when the first designation occurred, there had not been a designation of a confidential human source. So you couldn't have identified it as a CHS then. Only after the designation was that person a CHS. Yeah. I think it just gives a little bit too much substance to this quote-unquote designation of CHS, almost like knighting. But it could have easily been cleared up, where CHS previously referred to as AM, or AM subsequently referred to as CHS, to distinguish the fact – I totally agree with what you're saying, Judge Abell, as far as the timing of when the first person first came in was AM, later on was designated as CHS through whoever the FBI wants to do that. But it could have easily been demonstrated to the issuing judge that AM and CHS are indeed the same person. I guess what I'm hearing from – I think your concern is there's sort of a strength in numbers component to getting a warrant. Absolutely.  In this case, if you only had two people and not what seemed to be three people, is it materially different? And I say this, and this is always a dangerous place to tread, but I reviewed a lot of warrants in my time. I know. And I never looked at them thinking, wow, they had six people that said this. I mean, if they had one person with really good stuff, it was good enough. Okay, well, in this case, Judge, you don't have one person with really good stuff. And particularly when, as Chief Judge Johnson relied on kind of this cross-corroborating information, was using one to corroborate the other, when neither of which standing alone could be corroborated themselves, I do believe that the strength in numbers theory was exactly what the government was going for in a situation like this. And I really apologize about the extra four minutes. It wasn't your fault. You were ready to sit down, and we kept bothering you. Well, thank you all very much for your time. I appreciate it. Okay, well, I appreciate it. Thank you for your argument. Mr. Mishlevietz? Good morning. May it please the Court, my name is Paul Mishlevietz. I represent the United States in this matter. The United States asked this Court to affirm Judge Johnson in all respects. Judge Johnson's analysis on the search warrant was complete and clear-eyed as to all the things that the Court has asked Mr. Myers about earlier this morning. The decision to allow some very limited evidence of Task Force Officer Sullivan's interaction with SS was made only after defense counsel, not Mr. Myers, other defense counsel, opened the door to that on opening argument by misleading the jury, by telling them that what the jury had to focus on was the lack of integrity in the government's investigation, and specifically the lack of investigation into the possible possession of the pistol by SS, which was untrue. They did significant investigation on that. Judge Johnson had excluded it for confrontation clause grounds, for hearsay grounds, but in the written order excluding that information, Judge Johnson had warned the defense that they might open the door, they might invite evidence of that type depending on what they say or do at trial, which is exactly what happened. And the government, as you can see from Volume 3, which is the trial's transcript, the government didn't spring that door open. Hearsay information, but rather there was a conference with the judge outside the presence of the jury at which the United States presented their argument and evidence as to why the United States took the position that the defense had opened the door to that evidence. Judge Johnson took it into advisement over an evening. He came back the next day with a draft transcript of the opening, even though, of course, the trial transcript wasn't available yet. We were in the middle of the trial, but he had highlighted and he pointed out to the defense, here are the exact places where I find that you crossed the line. And for that reason, Task Force Officer Sullivan was not allowed to testify to everything in her 302. She was not allowed to testify to everything in her interaction with SS. The domestic violence evidence, her saying, I fell while I was riding a bike and had an injury to her eye. Judge Johnson kept that out because that wasn't necessary in Judge Johnson's view to respond to the comments on defense opening statement. But the equivocal statements where SS said, I clean the house every day, I don't like guns, I don't want a gun in my house, from which someone could infer that she was stating affirmatively that there was no gun in the house. And then when Task Officer Sullivan gets notified by other people on the search team that a pistol had been found, she says, oh, that's mine. But then when she gets quizzed on the parts of the pistol, she doesn't know how to load it. She doesn't know what a magazine well is. She makes statements from which someone could infer it's not really her possession. Judge Johnson picked and chose what parts of Task Force Officer Sullivan's interaction with SS were necessary to respond to what the defense had done in opening statement and what the defense had done in cross-examination of Special Agent John Laboon, where John Laboon was criticized for the fact that there is no federal marriage database. And when you look in the cross-examination of Special Agent Laboon, you'll see him answering Mr. Meyer's questions. Well, I did checks, but there is no federal marriage check. If you knew the state in which someone got married, you could maybe go to every county office in the state and ask if each county had a record. But there's no federal version of a database that includes that information for every county in the United States. And that was a topic of pointed inquiry of Special Agent Laboon on his cross-examination. So then Judge Johnson gave the curing instruction that the defense requested at the time the defense requested it. He invited their argument and their submissions not only as to the content of the limiting instruction, but when the limiting instruction should be given so that the jury wouldn't take the evidence for any improper purpose. And so for those reasons, I urge the court to find that Judge Johnson did not abuse his discretion in responding in a very limited and specific fashion to the comments the defense made in their opening statement and in their cross-examination of Special Agent Laboon. Let me ask you about your search warrant. Yes, sir. So looking at the warrant, it seems to me the big problem you have with your warrant is that a lot of the information seems stale. How do you respond to that? I respond by pointing out Judge Johnson's review, which you're going to find in Volume 1 of the Record on Appeal. He specifically talks about staleness. He talks about staleness most specifically on page 39 of the Record on Appeal, Volume 1, where he notes that Anthony Menacucci saw the firearm at the target residence in July of 2019 and heard and relayed to Special Agent Laboon that the plan if Hassan al-Qahtani got caught was to say it was his girlfriend's pistol, and then in August, you have the tip from Arvey. In September, you have the interview of Arvey, and Arvey tells the same tale that al-Qahtani told him. If I get caught with this, it'll be fine. I'll tell them that it's my girlfriend's or my girlfriend will claim it. Then further investigation in October, you have a second interview with Arvey with further detail, but that detail again, the girlfriend claiming detail again. Then the investigation continues into November when you have several things happen. The last of them, I think it was November 18th, was the confirmation from the leasing office that both SS and al-Qahtani still lived at the apartment. You have AM's discussion with the defendant where the defendant said he wanted to buy another firearm, and so you have these continued ties both to the residence where AM said that the firearm came from when it was shown to him in person, and you have the ongoing connection to SS who was the girlfriend. We learned in trial that the two had gotten married, but al-Qahtani always described her to Arvey and AM as a girlfriend, so that's what the warrant says. You have the ongoing residence of her there, and since she is the one who the plan is going to claim the pistol, her still being at the residence is directly relevant to the expectation that the pistol will still be found at the residence. When's the last date before the warrant on which someone indicated that the pistol was there? I mean, because we got a lot of information about the people being there still, but I can't tell from that, because a firearm's easy to move, and so that's sort of the issue. Because it's easy to get out there, it seems like your information should be more recent. My answer is, to your specific question, that on November 14th, which is less than a month before the service of the search warrant, is the conversation in which al-Qahtani told AM that he wanted to buy another pistol. But that's a different question. That's not responsive. I think the record showed it was six months. Six months since the evidence of the gun being there. Saying I wanted to purchase another pistol doesn't say why. Maybe he wanted to purchase it because the first pistol was gone. Well, that's not true, Your Honor, and I can remind the Court that the Tenth Circuit rule is that you are allowed to consider trial testimony if it supports the district court suppression ruling, and here we have trial testimony. And here the trial testimony includes the actual recording of the conversation between AM and al-Qahtani, where al-Qahtani says, I already have the .380, but I want another one. And so you do know that al-Qahtani never said, I got rid of that old pistol because I didn't like it. Now I want something to replace it. When did that recording occur? My understanding, Your Honor, and we can look at Volume 3 for the examination of Anthony Menacucci, but my understanding is that is November 14th. So how long was that then? Within a month. Briefly on the Batson Challenge, I'll welcome questions on that, but the United States' position is that, first of all, the defense never established any prima facie case of retaliation or racial discrimination, and even when Judge Johnson asked the government to give their response just to have a complete record, the response was given, which was that Juror Number 12 had a bad experience with police officers. The government was concerned that she had a bias against police officers for that reason. The government was concerned that she wasn't being forthcoming about her dislike of police officers, and she had extensive tattoos that have no connection to race, and there's nothing about their content in the record. But did her experience with law enforcement, according to her own statement, have to do with her race? The short answer is yes. Her subjective reason for having bias against police officers is not the reason for the strike. You're not going to look in that record and see where someone disliked police officers for a non-race-based reason, and they were let on the jury, and she was struck from the jury after saying that her reason, her subjective reason for disliking police officers is that she feels she was targeted for her race. So it is true that that was her subjective reason, but that's not the reason for the strike. I guess I'm having trouble sort of situating this. Maybe doctrinally, I don't know. But I'm looking at your answer brief on page 31, and this is sort of where you make this argument, and you say the primary reasons proffered by the prosecutor for striking Juror 12 were concern about hostility to law enforcement, and the prosecutor's related impression that the juror was not being forthright with her feelings towards law enforcement. After experiencing what she felt was an unfair arrest, those explanations are race-neutral. I'm with you so far. Then it says, that is true even if the particular reason that Juror 12 suspected for her unfair treatment was her race. I'm not sure how under the Step 3 of Batson that that doesn't have some sort of inherent non-race-neutral quality to it. I mean, maybe it does, but you don't cite anything, and I just want to make sure I'm understanding how to evaluate the government's position according to the applicable law. Striking a person because they have bias against police officers is per se allowed. That is true regardless of the person's subjective lived history, that causes them to dislike police officers. It could be that they feel they were mistreated on the basis of race, religion, creed, national origin, all of the things that we protect as Americans. But that does not delete the bias against police officers that is the cause. But she said that she could be fair, right? Yes, and so Judge Johnson didn't strike her for cause. But then when Judge Johnson evaluated my proffered reasons, he found them legitimate, and that's reviewed for clear error. And the review of that is Judge Johnson at that point is evaluating your credibility. Yes, Judge Johnson could have said, Mr. Prosecutor, he'd probably call me by name, but he could have said, I have reviewed your proffered reasons, but because of how the dialogue went that I was in the room to see, because of how the subjective reasons of juror number 12 were so closely tied with race, I just can't disconnect your follow-up questioning of her from the whole topic of race, and therefore I as the district court judge find that I'm going to put this juror on the jury. That decision, too, would get reviewed for clear error. And so I guess part of my answer is we in this room aren't in the position to observe that with our eyes and hear it with our ears, and Chief Judge Johnson was, and he made the call, and the United States respectfully requests this court not disrupt that call and not attribute any kind of error to it, but certainly not clear error. I have 12 seconds left, but I'll answer as fast as I can if you have more questions. I've got one more. I just wanted to get your response to the Franks issue, to maybe have you elaborate a little bit more on what the government's position is. As far as I can tell from the record, the defendant here did satisfy his burden for requesting a Franks hearing, and I don't see why that issue isn't preserved. The defense did not appeal the denial of the grant of the Franks hearing, either in the opening brief or the reply brief. The defense asked this court to make factual findings about the materiality of any misstatements or the intent of Special Agent Laboon upon making any misstatements or failing to make any statements, and this court cannot make those factual findings as a court of first review. This court can review the record on which Judge Johnson was asked to hold a Franks hearing. The court can review Judge Johnson's written reasons for denying a Franks hearing, and if the defense had appealed that decision and said, this is why the court should have granted a Franks hearing, here is the standard that I would like the court to apply, because the Tenth Circuit doesn't have a standard yet for reviewing the denial of a Franks hearing. That could be before the court, but the defense didn't do that. They didn't even do it in their reply brief, which is why one of the reasons you noticed I didn't file a motion requesting leave to sir reply. And so this court, and I'm not the one who determines that this court can't make those factual findings in the first instance. It's this court's own rule, which I cited in my response brief, my answer brief. But if this court finds that Judge Johnson could have granted a Franks brief and could have found that the defense made a substantial preliminary showing of Franks concern, that's not enough in the view of the United States to remand and command Judge Johnson to hold a Franks hearing. There's no reason to believe that Judge Johnson would find anything after a Franks hearing that's different than what he had in front of him when he decided the Franks hearing. Though, I will point out that now we have the trial record where we can see the trial testimony of Special Agent Laboon. We can see the cross-examination about A.M. first being listed as A.M. And then John Laboon says, well, then he went through the vetting process. And since he was officially an FBI CHS, I had to follow FBI rules and I had to describe him as a CHS. Because when Special Agent Laboon writes his affidavit, yet the audience is Judge Molson, but he has to write it according to FBI protocols because that's the kind of guy he is. And that's what testimony you're going to see from him in Volume 3. And so after you review Volume 3, after you review his trial testimony, after you review a very vigorous cross-examination of Special Agent Laboon, you are going to be confident that Judge Johnson, even if you made him go back and hold a Franks hearing, it wouldn't have any different result in this case. No different evidence would come in at trial, respectfully. Okay. Thank you, Counsel. Yes, Your Honor. Mr. Myers? Yes. We were discussing earlier with you the 302s and whether they were in the record. Yes. And I think Judge Rossman wasn't sure if they were in the record or not. But what we were going to ask you is if you would supplement the record with those if they're not already in there. And if they are in there, would you just notify us with a 28-J letter where they are? I would be happy to. Okay. Thank you very much. And do you mean the 302s that were used for the sentencing hearing, Your Honor, or also the 302 that was a court exhibit where Judge Johnson told us what was going to be allowed from Task Force Officer Sullivan's interview of SS and what was going to remain excluded from that 302? My question related to the enhancement. Yes, ma'am. Thank you. Thank you for the extra time on behalf of Paul as well. Okay. You bet. Thanks. Okay. The case will be submitted. Counsel are excused. Thank you both for your arguments.